# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DALE CALVIN WHITMER, | 1:07-CV-01769 OWW GSA HC |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| JAMES A. YATES, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of San Diego, following his conviction on October 2, 1997, by jury trial of second degree murder in violation of Cal. Penal Code § 187(a). See Petition at 3. Petitioner was sentenced to serve an indeterminate term of 15 years to life with the possibility of parole. Id. His minimum eligible parole date was January 24, 2007. See Attachment to Petition, Board of Parole Hearing Transcript ("BPH") at 1.

On March 7, 2006, Petitioner's first parole suitability hearing was held before the

1

1  California Board of Parole Hearings (hereinafter "Board"). <u>Id</u>. Petitioner participated in the
2  hearing and was represented by counsel. <u>Id</u>. At the conclusion of the hearing, the Board denied
3  parole and deferred rehearing for four years. <u>Id</u>. at 95.

4      Petitioner then sought relief in the state courts. On August 21, 2006, he filed a petition for
5  writ of habeas corpus in the Riverside County Superior Court. <u>See</u> Petition at 56. The superior
6  court denied the petition on September 18, 2006. <u>See</u> Petition at 50. He then filed a habeas
7  petition in the California Court of Appeal, Fourth Appellate District. <u>See</u> Petition at 20. The
8  petition was summarily denied on April 17, 2007. <u>See</u> Answer, Exhibit A. On May 2, 2007,
9  Petitioner filed a petition for review in the California Supreme Court. <u>See</u> Answer, Exhibit B.
10 The petition was denied on July 13, 2007. <u>See</u> Answer, Exhibit C.

11     Petitioner filed the instant petition for writ of habeas corpus in this Court on
12 September 26, 2007. He claims his due process rights were violated when the Board denied him
13 parole. Respondent filed an answer to the petition on May 1, 2008, and Petitioner filed a traverse
14 on May 22, 2008.

15                       **FACTUAL BACKGROUND**[1]

16     On March 29, 1994, the victim, Don Harden, age 74, was last seen by neighbors driving
17 his white truck with Petitioner as a passenger. The next time they saw the truck, Petitioner was
18 driving and he was seen loading items from the victim's house into the bed of the truck. He
19 returned a second time late in the evening, backed up close to the victim's back door and
20 appeared to be loading additional items into the truck.

21     On March 31, 1994, the victim's daughter, alerted by neighbors, began to look for her
22 father. On April 6, 1994, they hired a locksmith to gain entry into the father's home and noted
23 that the cane he used was in the home. His prescription medication was on the counter. His mail
24 had been last collected on March 28, 1994. He had gone missing and was nowhere to be found.
25 Further, lying next to the door was a bill to be mailed with a check written by the victim dated
26 March 29, 1994. The TV Guide was open to the date of March 29, 1994. Property, specifically

27 ―――――――――――――――――
28     [1]This summary is derived from the factual summary set forth in the parole hearing which was taken in turn from the probation officer's report. <u>See</u> BPH at 18-25.

the victim's TV and VCR, appeared to be missing. The victim's daughter called the San Diego Police Department and filed a missing person's report. It was noted in the report that the victim had been missing from his home.

On April 6, 1994, an employee of the recycling center discovered a pair of severed human hands, partially enclosed in a plastic bag lying next to a stack of cardboard. The cardboard had been delivered to the recycling center on April 6, 1994, at approximately 3:30 p.m. The hands were discovered at 5:00 p.m.

On April 7, 1994, homicide detectives went to the victim's residence located at 5620 Gables Street in San Diego. They noted that there appeared to be no evidence of forced entry. They discovered evidence of blood in the kitchen and bathroom. Also in the bathroom it was noted the shower curtain had been missing as were the towels from the rack. There was a film of cleanser powder on the floor of the kitchen as in the bathroom. There was evidence of smudge marks in the bathroom as if somebody had gone through a great effort to clean. They were also able to determine through forensic evidence that major bloodletting had occurred in the bathroom, specifically in the bathtub. They also found a piece of human flesh wedged in the wall of the bathroom.

On April 11, 1994, positive fingerprint identification was made on the victim's hands using his military records. It appeared the victim had been murdered in his home and his body removed. As Petitioner was the last person seen with the victim alive, he was interviewed on April 8, 1994, and admitted moving articles from the victim's home but stated he did so at the direction of the victim. He claimed he once lived in the victim's motor home parked in the yard of the property for about a year and a half but had moved on March 1, 1994. He did not return to the victim's house until March 28, 1994, when he went to see how the victim was doing. The victim told him to remove property he had left behind that was now in trash bags. Petitioner stated he loaded the bags into the victim's truck and the victim drove him to 3837 Wabash Avenue and dropped him off. Petitioner returned to the victim's home at approximately 6:00 p.m. He waited for the victim to come home. He went to the house to retrieve his remaining possessions. The victim told him to load his TV, VCR, a cabinet containing a microwave and

two or three boxes and two or three grocery bags of unknown property. Petitioner and the victim drove to a restaurant in National City where he dropped the victim off. He told Petitioner to go and drop off his property and return to the restaurant. Petitioner claims he did so and the last time he saw the victim was when he got into his truck and he said goodbye.

On April 16, 1994, search warrants were served at several residences connected to Petitioner, on several vehicles, and on Petitioner himself. At the residence where Petitioner was staying at that time with several members of his family and his own daughter, numerous items belonging to the victim were recovered. In a pocket of a jacket belonging to Petitioner was found a set of keys. One of the keys was found through investigation to belong to the victim's residence. Detectives knew they were probably dealing with the homicide and Petitioner was a suspect. However, the investigation was ongoing.

On April 24, 1995, a year later, a letter addressed to a homicide detective was received at the San Diego Police Department homicide office. The letter was from an anonymous person who supplied information regarding details of the homicide of the victim and named Petitioner as the murderer. The author of the letter stated that he had counseled a person who wished to remain anonymous who had given him information during the counseling session. The information was basically that Petitioner had confessed the murder to the person being counseled. Upon investigation it was discovered the anonymous person was Petitioner's daughter, Andrea, who had sought counseling from a Mormon bishop. Andrea stated to the bishop Petitioner had told her the police were talking to him about the victim's death but he was convinced that they would never catch him. He had told her several years earlier that if he ever needed to dispose of a body he would put the body in a bathtub and fill it full of warm water. He would then dismember the body and put different pieces in different garbage bags. Then he would dump and bury the pieces and scatter them in all areas. He told Andrea that the victim's body had been disposed of and during the disposal one of the bags broke and the victim's hands fell out of the bag, but Petitioner did not have time to pick them up. Petitioner's daughter through the urging of the bishop reluctantly agreed to be interviewed by the police. Petitioner was subsequently arrested on October 29, 1996, and charged with the victim's murder.

**DISCUSSION**

I. Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

*quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state

6

court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

As noted above, Petitioner's claims were presented in a petition for writ of habeas corpus to the Riverside County Superior Court. The superior court denied the petition, and Petitioner then presented his claims to the appellate court and to the California Supreme Court. Those petitions were also denied.

II.     Review of Petition

A.  Parole Denial

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 12 (1979) (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, an inmate is guaranteed the following process: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; and 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole." Id. It is clear from the record these three guarantees were given. Petitioner received notice of the hearing, he was heard at the hearing and he was told why he did not qualify for parole.

"In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation of *good time* does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by *some evidence* in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.2006) (emphasis added).

7

1  The Ninth Circuit has held that this same standard also extends to parole determinations. Irons v.
2  Carey, 505 F.3d 846, 851 (9th Cir.2007), *quoting* Hill, 472 U.S. at 457 ("We have held that 'the
3  Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due
4  process with respect to this interest if the board's decision is not supported by 'some evidence in
5  the record,' or is 'otherwise arbitrary.'"). In assessing "whether a state parole board's suitability
6  determination was supported by 'some evidence' in a habeas case, our analysis is framed by the
7  statutes and regulations governing parole suitability determinations in the relevant state." Irons,
8  505 F.3d at 851. Here, the Court must look to California law and review the record. In reviewing
9  the record and determining whether the "some evidence" standard is met, the Court need not
10 examine the entire record, independently assess the credibility of witnesses, or re-weigh the
11 evidence.  Sass, 461 F.3d at 1128.
12         California law provides that after an inmate has served the minimum term of confinement
13 required by statute, the Board "shall set a release date unless it determines that the gravity of the
14 current convicted offense or offenses, or the timing and gravity of current or past convicted
15 offense or offenses, is such that consideration of the public safety requires a more lengthy period
16 of incarceration for" the prisoner. Cal. Penal Code § 3041(b). "[I]f in the judgment of the panel
17 the prisoner will pose an unreasonable risk of danger to society if released from prison," the
18 prisoner must be found unsuitable and denied parole. Cal. Code Regs. tit. 15, § 2402(a). The
19 Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors it
20 has set forth in the California Code of Regulations.
21         To determine whether 'some evidence' supports the state court decision, the test is not
22 whether some evidence supports the reasons cited for denying parole, "but whether some
23 evidence indicates a parolee's release unreasonably endangers public safety." In re Lee, 143
24 Cal.App.4th 1400, 1408 (Cal.Ct.App.2006).
25         In denying parole in this case, the Board based its decision on the following factors: 1)
26 The horrific nature and gravity of the commitment offense; 2) An escalating pattern of criminal
27 behavior; 3) Unstable social history; 4) Failure to participate in self-help programming; and 5)
28 Unfavorable psychological evaluation. Petitioner argues the Board's decision is supported by

false information. Review of the Board's decision reveals the state court decision approving the Board's determination of unsuitability was not unreasonable.

The first factor mentioned by the Board in its decision was the commitment offense itself, with the Board determining the offense was committed in an especially heinous, atrocious and cruel manner. This finding was well-supported. The victim was mutilated during or after the offense. Cal. Code Regs. tit. 15, § 2402(c)(1)(C). In support, the Board noted that Petitioner had dismembered the victim's body. See BPH at 86. In addition, the Board determined the motive was very trivial in relationship to the brutal nature of the crime. Cal. Code Regs. tit. 15, § 2402(c)(1)(E). The Board noted the motive for the crime was to obtain small household items and minor appliances. See BPH at 87. Given the facts of the case, the state court's determination that the Board's finding, that the offense was committed in an especially heinous, atrocious and cruel manner was supported by at least some evidence, was reasonable.

Next, pursuant to § 2402(c)(2) the Board determined Petitioner's previous record of violence demonstrated unsuitability. See BPH at 90. The Board noted that Petitioner had sustained arrests and/or convictions for possession of marijuana, involuntary manslaughter, drunk driving, and harassing phone calls. Id.

The Board then found Petitioner had a history of unstable and tumultuous relationships with others pursuant to § 2402(c)(3). See BPH at 90. The Board considered the fact that a file had been opened in 1984 with Child Protective Services with respect to beatings he had administered to his nine-year-old son and six-year-old daughter. Id. The Board also considered a 1991 incident where Petitioner had attacked his daughter, choked her and cut off her hair. Id. Finally, the Board considered a complaint regarding molestation occurring over many years by Petitioner upon his daughter. Id. Petitioner takes issue with this finding complaining that this evidence is false and should not have been included. He claims the information was derived from a false psychological evaluation and a report written by the district attorney that contained false information. As noted by Respondent, there is nothing to support Petitioner's contention other than his own allegation. The Board had before it the psychological evaluation. The Board also considered the district attorney's statement which had been in the file since 1997. In addition, the

district attorney testified at the hearing that he had personally contacted Child Protective Services to confirm the allegations. Petitioner on the other hand strongly denied these accusations at the hearing. The Board considered the evidence presented and found Petitioner's denials were not credible. In light of the facts, the state court's determination that the finding was supported by some evidence was reasonable.

The Board next noted that Petitioner had programmed in only a limited manner while incarcerated. Id. at 91. Petitioner had failed to develop a certified marketable skill, and he had not participated in a substance self-help program. The Board concluded Petitioner needed to participate in such a program to demonstrate rehabilitation.

Finally, the Board considered the psychiatric evaluation prepared by M. D. Smith, Ph.D., on February 4, 2006. Id. In it, Dr. Smith determined Petitioner must be considered a dangerous risk to the public and unsafe for parole at the time. Id. Petitioner had failed to address his multiple criminal acts, he had failed to show insight or remorse, and he therefore presented himself as a serious risk of danger to the public.

The Board also considered circumstances which tended to show suitability pursuant to § 2402(d). See BPH at 92. Petitioner earned an A.A. degree while in prison, and he had remained disciplinary-free during his incarceration.  Nevertheless, the Board concluded that the nature and gravity of Petitioner's offense, his previous record of criminal behavior, his unstable social history, his lack of programming, and the negative psychiatric evaluation showed Petitioner to be an unreasonable risk of danger to the public if released. This Court cannot conclude that the state court rejection of Petitioner's claim - that the Board's determination was not supported by some evidence - was unreasonable.

B.  False Information

Petitioner takes great issue with certain information used by the Board. He complains that the district attorney's 1997 statement contains false information. He complains that the psychiatric evaluation also contains false information. He further claims he did not receive the evaluation prior to the hearing and therefore could not defend against it. He asks that these two items be removed from his central file.

Respondent correctly argues that these claims are not cognizable in a federal habeas action. First, the district attorney's statement was an official court document provided pursuant to Cal. Penal Code § 1203.01 on December 2, 1997. Petitioner's claim that this document contains false information is completely a state law issue and should be addressed administratively or in state court. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990). The same rationale applies to the psychological evaluation. The psychologist prepared the report based on information obtained from Petitioner and his central file. To the extent Petitioner wishes to challenge the report, he must do so administratively or raise his concerns with the Board itself, which he has already done. This Court is not charged with examining the entire record, independently assessing the credibility of witnesses, or re-weighing the evidence. Sass, 461 F.3d at 1128. Rather, this Court must determine whether the state court finding that some evidence supported the Board's decision was not unreasonable. As discussed above, the Board's decision was reasonable. Accordingly, Petitioner is not entitled to habeas relief.

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The Petition for Writ of Habeas Corpus be DENIED; and

2. The Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Finding and Recommendation will then be submitted to the District Court for review of the Magistrate

1 Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file
2 objections within the specified time may waive the right to appeal the Order of the District Court.
3 Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5  IT IS SO ORDERED.
6  Dated:   **October 1, 2008**                    **/s/ Gary S. Austin**
                                                  UNITED STATES MAGISTRATE JUDGE